918 F.2d 178
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Sharon L. BRADEN, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH & HUMAN SERVICES, Defendant-Appellee.
 No. 90-3028.
 United States Court of Appeals, Sixth Circuit.
 Nov. 14, 1990.
 
 Before MILBURN, BOGGS and SUHRHEINRICH, Circuit Judges.
 Per Curiam.
 
 
 1
 Sharon Braden applied for social security disability benefits on September 23, 1987. Following an initial denial, she successfully petitioned for rehearing. Although she was represented by counsel at the second proceeding, her application again was denied. Thereafter, she sought review of the administrative law judge's decision in the United States District Court for the Southern District of Ohio pursuant to 42 U.S.C. Sec. 405(g). On the recommendation of a magistrate, the district court affirmed the Secretary's decision. An appeal to this court followed. Having considered the record and the briefs submitted by counsel for both parties and heard the oral argument, we affirm the district court in all respects.
 
 
 2
 * Appellant suffers from hypertension, obesity, and other ailments. The chief issue in this case is whether the finding of the Secretary, that appellant retains the residual functional capacity to do sedentary work on a full-time and part-time basis, despite her hypertension, is supported by substantial evidence. Secondary issues raised by the appellant challenge the ALJ's finding that the capacity to do part-time work will disqualify her from benefits and his further finding that her testimony as to the extent of her impairment is not entirely credible.
 
 II
 
 3
 * 20 C.F.R. Sec. 404.1520 sets out a five-step analysis for determining eligibility for disability insurance benefits. In order to award benefits, the Secretary must find, first, that the claimant is not gainfully employed, and second, that she is severely impaired. Once these requisites are met, the third step is to determine whether the claimant's impairment is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If it is, the claimant is considered disabled and eligible for benefits. If not, the analysis proceeds to its final two steps.
 
 
 4
 The first three stages of the disability inquiry are not at issue here. There is no controversy as to the first. The outcome of stage two favored the appellant, because the ALJ found her hypertension severely impairing. The third step in the inquiry is merely pro forma in this case. Appellant does not maintain that she has a listed impairment. The contention between the parties arises at the fourth and fifth stages of the disability inquiry.
 
 
 5
 Preliminary to these stages is a determination of the claimant's residual functional capacity by the administrative law judge. See 20 C.F.R. Secs. 404.1520(e) & (f), 404.1546. Once this is assessed, it is the claimant's burden in the fourth step to show that she cannot return to her past relevant work. Allen v. Califano, 613 F.2d 139, 145 (6th Cir.1980). If the claimant can return, benefits are to be denied. If she cannot, the Secretary must then demonstrate that alternate jobs are available to her in the economy, considering her residual capacity and other factors. Ibid. If the availability of alternate employment is not demonstrated, benefits are awarded. This demonstration is the fifth step of the disability analysis. At this step, if claimant has the full range of her residual functional capacity, 20 C.F.R. Part 404, Subpart P, App. 2 (the "grids") may be used to determine whether a claimant is disabled. If she cannot perform a full range of work at the given residual functional capacity, the ALJ must make an individualized inquiry into what jobs exist that the claimant can perform.
 
 
 6
 The focus of controversy in this case is the finding of the ALJ that appellant has a residual functional capacity for sedentary work. This conclusion supplies the ground common to the findings that appellant can return to her past relevant work and that she can obtain alternate employment. Either finding is sufficient to justify a denial of benefits, and both are disputed by appellant.
 
 
 7
 The standards by which this court must evaluate the ALJ's findings are familiar. A claimant denied disability benefits under the Social Security Act may seek judicial review in the district courts. 42 U.S.C. Sec. 405(g). The findings of the Secretary as to fact are conclusive if supported by substantial evidence. Ibid. Substantial evidence is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. McCormick v. Secretary of Health & Human Services, 861 F.2d 998, 1001 (6th Cir.1988). In deciding whether the administrative findings are supported by substantial evidence, the court must consider the record as a whole. Garner v. Heckler, 745 F.2d 383, 388 (6th Cir.1984). However, the court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. Id. at 387. If the administrative decision is supported by substantial evidence, it must be affirmed even if the court as trier of fact would have arrived at a different conclusion. Elkins v. Secretary of Health and Human Services, 658 F.2d 437, 439 (6th Cir.1981).
 
 B
 
 8
 The evidence before the ALJ when he rendered his decision was the testimony of appellant herself, an affidavit filed by a former employer, "progress notes" compiled by her physician, the written opinion of a consulting physician employed by the government, and the testimony of a vocational expert.
 
 
 9
 Briefly summarized, the record shows that appellant worked as a bookkeeper at Shur-Fit Distributors from March 1979. She began treatment for hypertension in April 1981. At the time, her blood pressure was 160/110. Treatment consisted of medication and periodic monitoring of her blood pressure. She continued working for another five years until August 1986, when she quit and subsequently applied for disability benefits. Appellant testified that she quit because she was having spells of dizziness that caused her to miss work and occasionally to faint on the job. An entry in her physician's "progress notes" dated near the time of her resignation indicated that the doctor had been "instrumental in asking her to [quit work]" and that her condition improved after she quit.
 
 
 10
 Through the remainder of 1986 and throughout the following year, appellant's condition improved as she continued under her physician's care. In January 1987, she took a part-time job as a tax preparer but held it for only three weeks. Regarding her reasons for quitting, appellant merely testified, "I just couldn't do it." The context of the testimony implies that the dizziness that had forced her from Shur-Fit had reasserted itself. Nonetheless, such evidence as there is in this case does not support this implication. She relates no incidents of dizziness or fainting while working as a tax preparer. More importantly, her physician's "progress notes" dated January 6, 1989 indicate that her blood pressure was under reasonable control and that she was handling the tax preparer's job. The "progress notes" also indicate periodic deterioration in appellant's condition, signalled by increases in her blood pressure. The timing of these episodes and the physician's comments do not suggest any cause for these relapses other than appellant's occasional departure from her regime of medication or the stress of family problems. The "progress notes" do not provide any grounds for believing that appellant's part-time employment is contrary to her physician's advice. On the contrary, the physician seems to regard appellant's part-time employment as a sign of her improvement under his care.
 
 
 11
 In addition to this evidence of appellant's physical condition and work history, the record includes the opinion of the government's consulting physician that appellant's hypertension was under control. On the basis of this evidence, the ALJ found that appellant was capable of performing sedentary work not involving high levels of stress. Hence, he found further that she could perform her past relevant work as a bookkeeper, since these limitations did not preclude such employment.
 
 
 12
 The ALJ next considered the jobs in the economy that appellant could perform in addition to bookkeeping. On the basis of the testimony of the vocational expert, he found some 4,000 sedentary, part-time jobs in the regional economy that a person with appellant's disabilities could perform.
 
 C
 
 13
 At the administrative hearing and again before this court, appellant has argued that the stress of work causes her to become dizzy and that she must lie down for an hour or so to recover. She argues that she cannot work, full-time or part-time, because employers do not have the facilities to accommodate her need for periodic recumbency. She also argues that her condition improved after she quit Shur-Fit and that this amelioration demonstrates that work severely aggravates her hypertension, thereby excluding her from gainful employment.
 
 
 14
 Reduced to its essence, appellant's case is that a symptom of her hypertension, dizziness, so severely impairs her that she cannot do even sedentary work. 42 U.S.C.A. Sec. 423(d)(5)(A) (West 1983 & Supp.1990) establishes a two pronged test for evaluating claims of this sort. First, it must be established that there is objective medical evidence of an underlying medical condition. Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir.1986). If there is, it must then be determined whether objective medical evidence confirms the severity of the alleged symptom arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the disabling symptoms complained of. Ibid.
 
 
 15
 Appellant's case passes the first part of the test. Her physician's "progress notes" establish that she suffers from hypertension. Nonetheless, appellant cannot satisfy the second part of the test. There is no medical evidence confirming the severity or frequency of her dizzy spells or establishing that her hypertension is so severe that it could produce dizzy spells of the sort that would require her to lie down regularly. There is some proof approaching the quality of objective medical evidence that this may have been the case in August 1986, when appellant quit work at Shur-Fit. But there is no proof of the requisite quality that at the time of the hearing appellant had such symptoms other than the opinion of her physician that appellant should work only part-time. There are no grounds for this advice other than the patient's complaints. The opinion of the treating physician need not be given deference if it is not based on sufficient medical data. Accord Sizemore v. Secretary of Health and Human Services, 865 F.2d 709, 711-12 (6th Cir.1988); Harris v. Heckler, 756 F.2d 431, 435 (6th Cir.1985).
 
 
 16
 Besides the insufficiency of the medical evidence, there are additional reasons for maintaining that the determinations of the Secretary are appropriately supported. Appellant held a job at Shur-Fit for a number of years, despite her hypertension. When an individual has worked with an impairment over a period of years, the ALJ is entitled to conclude that his condition is not disabling. See Banks v. Celebrezze, 341 F.2d 801, 804 (6th Cir.1965). In addition, appellant returned to work for a time in January 1987. There is no satisfactory explanation in terms of hypertension for her leaving this job. Finally, throughout his "progress notes," the physician expresses the opinion that his patient can handle part-time work. While this last datum is not evidence that appellant can work full-time, as the others are, it is substantial evidence that she can work part-time.
 
 
 17
 In sum, there was ample evidence available to the ALJ when he concluded that appellant can perform low-stress, part-time or full-time sedentary work.
 
 III
 
 18
 The findings that appellant is capable of part-time, sedentary work involving little stress and that jobs exist for persons with her residual functional capacity are fatal to her claim. Seeking to avoid the consequences of those finding, she raises the following issue: "Is the ability to perform sedentary part-time work substantial gainful activity [as] that term is used in the statute?" Under this heading, a number of distinct arguments are marshalled.
 
 
 19
 First, appellant appears to argue that the part-time work available to her is not substantial and gainful in the sense that it is not sufficiently remunerative to justify a denial of benefits. This argument is without merit. The pertinent regulations provide that activities undertaken between 1979 and 1990 and earning as little as three hundred dollars a month are presumed to be "substantial gainful activities" for statutory purposes. 20 C.F.R. Sec. 404.1574(b)(2)(vi). See also Cavanaugh v. Secretary of Health & Human Services, No. 87-3681 (6th Cir. May 19, 1988) (unpublished) (per curiam) (holding that a part-time position paying approximately five hundred dollars a month as a city councilman was substantial gainful activity).
 
 
 20
 Curiously, in order to support her position on this issue, appellant cites Parish v. Califano, 642 F.2d 188 (6th Cir.1988), a case in which this court reversed a denial of benefits to a plaintiff who was a part-time college student and had been employed part-time as a student counsellor. Reliance on Parish is completely misplaced. The plaintiff in that case suffered from multiple sclerosis and had been asked by her employer to resign. Id. at 192. Parish does not hold that part-time work is not substantial gainful activity. Rather it signifies that being asked to leave an undemanding job is evidence of the lack of the "residual functional capacity" to work even part-time.
 
 
 21
 Second, appellant cites Cavitt v. Schweiker, 704 F.2d 1193, 1195 (10th Cir.1983), which held that the use of 20 C.F.R. Part 400, subpart P, Appendix 2 (the "grids") to deny benefits was inappropriate in the case of a claimant suffering from severe back pain and able to do sedentary work for only a brief period. The significance of this citation is unclear. Appellant appears to be protesting that "where an individual cannot perform a full-range or very nearly a full range of activities set forth in the exertional level of work, the [grids] cannot be applied." Nonetheless, the ALJ's twelfth finding concludes that Vocational Rules 201.15 and 201.22 would direct a determination of "not disabled," given claimant's residual capacity, age, education, and work experience. However, his thirteenth finding goes on to consider the functional limitations imposed on appellant presumably by her need to avoid high-stress jobs. Using the grids as a framework for decisionmaking, he finds that there are a significant number of job which appellant could perform, including invoice control clerk and accounts adjustable clerk. In sum, the ALJ did not use the grids to find the appellant "not disabled." Rather there was an independent inquiry into the jobs available in the national economy to someone with appellant's impairments.
 
 
 22
 Finally, appellant maintains that the ALJ incorrectly placed on her the burden of demonstrating that alternate employment does not exist for someone with her impairments. Her argument seems to be that although the vocational expert testified that a number of low-stress, sedentary, part-time jobs were available, she did not specify how many of these could accommodate appellant's need to lie down, thereby placing on appellant the burden of showing that satisfactory employment was unavailable.
 
 
 23
 This argument is without merit. Its first weakness has already been set forth. Appellant offers no objective medical evidence of her need to lie down. In addition, the testimony of the vocational expert met the Secretary's burden of demonstrating that sedentary, part-time jobs exist that she can perform. Appellant was free to attempt to diminish the persuasiveness of that testimony by arguing her need to lie down. The ALJ's decision neither to accept this argument nor to require testimony as to the availability of jobs accommodating appellant's need to lie down does not amount to shifting the Secretary's burden onto appellant.
 
 IV
 
 24
 Appellant's final assignment of error is based on an interchange between her counsel and the ALJ while the former was questioning her. Counsel was developing a record of the various symptoms his client exhibited at Shur-Fit when the ALJ stopped him, saying:
 
 
 25
 Well, counselor, we have this, you know, really we have his affidavit. I don't doubt the problems that she's testified about and I don't really think it's necessary to go into that. What we really don't have much is medical evidence which is really more important to me than her testimony, even though her creditability is certain[ly] not issue, we don't take issue with any of that. I don't see any need to belabor that.
 
 
 26
 The issue posed by appellant on the basis of this interchange is whether "the Administrative Law Judge [may] verbally find claimant's testimony credible during the hearing, and subsequent to the hearing reject such finding." This question is simply answered. The ALJ may change his mind after hearing additional evidence, reviewing the medical records, or just reflecting before issuing his opinion. Nothing binds him to follow his own dicta, stated in the course of a hearing, in his decision.
 
 
 27
 To support her attack on the ALJ's determination that she was not credible, appellant maintains that the ALJ should have spelled out his reasons for so finding rather than merely asserting his conclusion. The case she cites in support of his argument, Beaver v. Secretary of Health, Education & Welfare, 577 F.2d 383 (6th Cir.1978), is actually quite deferential to the ALJ's assessments of credibility. Id. at 387 ("The notion that special deference is owed to a credibility finding by a trier of fact is deeply imbedded in our law. The opportunity to observe the demeanor of a witness, evaluating what is said in the light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly."). Because of this deference, Beaver holds that if the Appeals Council wishes to overturn an ALJ's finding of credibility, the Council, not the ALJ, should identify the considerations leading it to do so. Ibid.
 
 
 28
 In sum, gaguing the credibility of a witness is within the province of the administrative law judge, and the appellant provides us with no reason for invading his realm.
 
 
 29
 For the foregoing reasons, the judgment of the trial court is AFFIRMED.